UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**Block E Hotel Capital, LLC and**          Civil No. 05-426 (JNE/SRN)
**Block E Hotel Capital II, LLC,**

      **Plaintiffs,**

                                  **REPORT AND RECOMMENDATION**

      v.

**Meridien Hotels, Inc. and**
**Juergen Bartels,**

      **Defendants.**

---

J. Michael Dady, Esq. and William Fulton, Esq. on behalf of Plaintiffs

Christopher R. Morris, Esq. and Gabriel M. Nugent, Esq. on behalf of Defendants

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Defendants' Motion to Stay Litigation and Motion to Dismiss (Doc. No. 11) and Plaintiffs' Motion to Stay Arbitration (Doc. No. 17). The undersigned has jurisdiction over these matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

**I.    BACKGROUND**

Plaintiffs Block E Hotel Capital, LLC (Block E-1) and Block E Hotel Capital II, LLC (Block E-2) are limited liability companies (hereafter referred to collectively as Block E) formed under Delaware law to own and operate a hotel in downtown Minneapolis called Le Meridien. (Amend. Compl. ¶ 3.) Block E is substantially owned by James J. Graves. (Id. ¶ 7.) Defendant Meridien Hotels, Inc. (MHI) owns the name and trademark "Meridien" and is a New York corporation with its

principal place of business in New York, New York. (Id. ¶ 4.) Defendant Juergen Bartels is a subject of Germany and resides in London. (Bartels Aff. ¶ 2.) Bartels was the Chief Executive Officer of Le Meridien, the parent company of MHI (Bartels Aff. ¶¶ 3-5), at the time MHI and Block E negotiated a hotel management agreement (Management Agreement) and when MHI negotiated a hotel submanagement agreement (Submanagement Agreement) with another corporate entity owned by Graves. (Amend. Compl. ¶ 13.)

Block E alleges that as part of the negotiations, Bartels made the following assertions:

- Meridien was in strong financial condition and was in a position to provide support and guidance to Graves and Block E for the development of Meridien in Minneapolis for the long term.

- Meridien was going to announce the opening of at least 20 Meridien hotels in the United States within the next 24 months, and that these hotels, as well as the entire Meridien system, would result in a large number of referrals and reservations to Plaintiffs' hotel.

- The Dallas and New Orleans hotels were going to remain with Meridien for the long term and were not going to close or change to any other affiliation.

- Meridien had developed a new concept for hotel décor and accessories called "Art & Tech" that had been implemented in some Meridien hotels with the result that these hotels were able to realize room rates 50 percent higher than they otherwise would be. Bartels assured Graves that building the Minneapolis hotel as an "Art & Tech" hotel would result in these greater revenues because it was an entirely new and unique concept and because the Meridien chain was converting many of its hotels to this new concept and would support it throughout the

world.

- Through Meridien's sophisticated reservations system, called the "Global Distribution System," which Meridien would significantly promote, Meridien would generate at least 65 percent of the total occupied rooms at Plaintiffs' hotel.

- Meridien could create a management agreement structure with Block E, pursuant to which Meridien would nominally manage the hotels but would subcontract the management back to Block E, and that this structure would avoid the need to comply with franchise laws under Minnesota, and that avoidance of these laws would be in Block E's and Meridien's best interests.

(Amended Compl. ¶ 11.)

The parties to the Agreements were represented by counsel. The Management and Submanagement agreements were executed on April 30, 2002 (Fulton Aff. Exs. A & B) and the hotel opened in May or June of 2003. The Management Agreement has a term of twenty-five years from the date of the opening of the hotel. (Id. Ex. A. § 3.1.) During the term of the Management Agreement, Block E is required to pay a percentage of hotel revenues and other fees to MHI. (Id. at Ex. A Art. VI.) Both the Management and Submanagement Agreements contain the following arbitration provision:

> <u>Mandatory Arbitration.</u> Notwithstanding the [governing law and venue provision], any dispute between the parties with respect to the amount of Pre-Opening Expenses, Gross Revenue, Room Revenue, Commercial Contribution, reservation fees, Gross Operating Expenses or the Management Fee for a Fiscal Year (or any amount which is a factor in determining any of the foregoing), the determination of the Competitive Set and the reasonableness of Operator's or Owner's disapproval of any matter requiring its approval shall be, at the written request of either Operator or Owner (the "Arbitration Request"),

3

> determined by arbitration to be conducted in this County and City of New York, State of New York, and in accordance with the terms [set forth in the remainder of the provision].

(Id. Ex. A § 22.19, Ex. B § 8.17.) The agreements also state that "[a]ny controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s)." (Id. Ex. A § 22.19(d), Ex. B § 8.17(d)) Section 22.12 of the Management Agreement states that the Management Agreement and the agreements referenced therein, "constitute the entire agreement between the parties relating to the subject matter thereof, superseding all prior agreements or undertakings, oral or written." (Id. Ex. A § 22.12.)

The Management Agreement contains an addendum that modifies Section 22.5 of the Management Agreement by adding the following text:

> The parties hereto acknowledge and agree that Minn. Stat. § 80C.21 and Minn. Rule 2860.4400J prohibit [MHI] from requiring litigation (but not arbitration) to be conducted outside Minnesota. In addition, nothing in the Agreement can abrogate or reduce any of [Block E's] rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction, except to the extent any of the foregoing are barred by Section 2 of the Federal Arbitration Act.

(Id. Ex. A (at Ex. G of Management Agreement ¶ 4.))

In April of 2004, MHI issued a notice to Block E of certain defaults under the Management Agreement relating to nonpayment of fees and expenses. The parties settled the nonpayment dispute. (See Nugent Aff. Ex. C.) The settlement agreement states that Block E's obligations under the settlement agreement's terms "shall be evidenced by its unsecured promissory note," labeled an, "Unsecured Arrearages Note," and attached as Exhibit A to the settlement agreement. (Id.) The note contains a mandatory arbitration provision broader than those provisions found in the Management and Submanagement Agreements. The note's arbitration provision provides:

4

> Maker and each Endorser and/or Guarantor [i.e., Block E and Mr. Graves] agree that any action, dispute, proceeding, claim or controversy between Maker or such Endorser and/or Guarantor and Payee [i.e., MHI], whether sounding in contract, tort or otherwise ("Dispute" or "Disputes") shall, at Payee's election, which election may be made at any time prior to the commencement of a judicial proceeding by Payee, or in the event of a judicial proceeding instituted by Maker or such Endorser and/or Guarantor at any time prior to the last day to answer and/or respond to a summons and/or complaint made by Maker or such Endorser and/or Guarantor, be resolved by arbitration in accordance with the provisions of this paragraph and shall, at the election of Payee, include all Disputes arising out of or in connection with (1) this Note or any related agreements or instruments, (2) all past, present and future agreements involving maker or such endorser and/or Guarantor and Payee, (3) any transaction related to this Note and all past, present and future transactions involving Maker or such Endorser and/or Guarantor and Payee, and (4) any aspect of the past, present or future relationship of Maker or such endorser and/or Guarantor and Payee.

(Id. Ex. D.)

On February 25, 2005, Block E filed this suit against MHI and Bartels. (Doc. No. 1.) On April 28, 2005, Block E filed its Amended Complaint which charges that MHI and Bartels violated the Minnesota Franchise Act, committed common law fraud, and committed negligent misrepresentations by making misleading statements of fact in connection with the hotel transaction. (Doc. No. 5 ¶¶ 18-34, 40-44.) Block E also seeks a declaration that it may terminate the Management Agreement as of May 1, 2005 under the terms of the Agreement. (Id. ¶¶ 35-39.)

On April 28, 2005, MHI filed a formal demand with the American Arbitration Association (AAA) in which it demanded that Block E arbitrate the claims and disputes set forth in its Complaint. (Nugent Aff. Ex. G.) These arbitration proceedings have commenced.

On May 17, 2005, MHI moved this Court to dismiss the claims against Bartels for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted and to stay the claims against MHI, or, in the alternative, to stay the claims against both MHI and Bartels, and to stay

the claims against MHI. (See Doc. Nos. 11, 18.) Separately, Block E moved the AAA for an order staying its proceedings. (Nugent Aff. Ex. F.) The AAA refused to stay its arbitration proceedings in the absence "of an agreement by the parties or a court order staying" the matter. (Id.) In response, on June 9, 2005, Block E moved this Court for an order staying the arbitration proceedings. (Doc. No. 17.) This Court heard oral arguments on both motions on July 28, 2005. (Doc. No. 44.)

## II. PARTIES' POSITIONS

MHI contends the Unsecured Arrearages Note's arbitration clause governs this dispute. MHI argues that the Note's arbitration clause unambiguously covers "any dispute" between Block E and MHI, and that MHI triggered its right to arbitrate the claims lodged by Block E in this lawsuit by filing an arbitration demand with the AAA. (Doc. No. 18 at 12.) As to the claims against Bartels, MHI contends that there is not a sufficient nexus between Bartels and Minnesota to hale him into court here. (Id. at 15-18.) Alternatively, MHI argues the fraud claim leveled at Bartels should be dismissed because it is not stated with particularity and because Bartels' alleged misrepresentations concern future events, no facts have been alleged that the misrepresentations were known to be false, no facts have been alleged to support that there was an intent to deceive, and insufficient facts have been alleged to assert that Block E relied on Bartels' statements. (Id. at 19-23.) MHI also moves to dismiss the negligent misrepresentation claim against Bartels because MHI claims Bartels owed no duty of reasonable care to Block E and no facts support the allegation of reliance. (Id. at 23-25.) MHI also argues that, even if dismissal is not warranted, the claims against Bartels are related to the claims against MHI and should be submitted to arbitration to avoid the possibility of inconsistent results and to prevent a waste of judicial resources. (Id. at 26-27.)

6

Block E counters that the parties did not agree to arbitrate this dispute because the terms of the Unsecured Arrearages Note stem from the Management Agreement that, in turn, gives Block E the right to litigate the present dispute at Section 22.5, which references the Minnesota Franchise Act, relevant provisions codified at Minn. Stat. § 80C.21.  (Id. at 25.)  Block E contends that the arbitration clause in dispute is not exclusive because it is not the only way to settle the dispute under the contract terms.  Finally, at oral argument, Block E asserted that mutuality is a requirement of enforceable arbitration agreements, citing Wiser v. Wayne Farms, 411 F.3d 923 (8th Cir. 2005).  Block E argues that the arbitration clause in dispute here is one-way, so not mutual and not enforceable.  Alternatively, Block E contends that if arbitration is mandated, then the Court should compel Bartels to participate in the arbitration and that the Court should order the arbitration to be venued in Minnesota.  (Id. at 25-27.)  Block E contends a Minnesota venue is mandated by the regulations promulgated pursuant to the Minnesota Franchise Act that state in part:

> All franchise contracts or agreements and any other device or practice of a franchisor shall conform to the following provisions. It shall be unfair and inequitable for any person to: . . . . require a franchisee to waive his or her rights to a jury trial or to waive rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction, or to consent to liquidated damages, termination penalties, or judgment notes, provided that this part shall not bar an exclusive arbitration clause.

(Id. at 26-27 (citing Minn. R. 2860.4400(J).)

Block E responds that Bartels has sufficient contacts with Minnesota for this Court to have specific jurisdiction over him.  (Doc. No. 32 at 13.)  Block E asserts that Bartels traveled to Minneapolis on March 1, 2002 to attend a news conference about the hotel venture, as the sole, official representative of MHI, with Graves.  (Id. at 5.)  At this conference, Bartels stated:

7

> The Art+Tech Hotel by La Meridien at Minneapolis will introduce the United States to a dramatically different style of hotel product offering an experience never seen before in a global luxury hotel group. We look forward to continuing to expand Art+Tech in other strategic markets as we move forward with our aggressive expansion plans for La Meridien both here and abroad.

(Id.) According to Block E, Bartels returned to Minnesota for the June 2003 opening of the hotel as a Meridien property; he also attended several meetings, including one where he spoke to the hotel's staff. (Id. at 6.) Block E also alleges Bartels "directed numerous telephone calls and correspondence to Graves in Minnesota." (Id. at 6.)

Block E argues further that it has sufficiently pled its fraud and negligent misrepresentation claims. As to the fraud claim, Block E points to the statements attributed to Bartels, as alleged in its Amended Complaint and cited above, as statements of contemporaneous fact that Bartels knew to be false and upon which Block E relied. (Id. at 19-21.) Block E likewise defends its negligent misrepresentation claim by arguing that Bartels owed a duty to Block E as a supplier of information in a business transaction and that he breached that duty by providing false information to Block E. (Id. at 22.)

## III. DISCUSSION

### A. Motion to Stay Litigation Against MHI

Congress enacted the FAA to establish a "national policy favoring arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984). Accordingly, there exists a strong federal presumption in favor of arbitration. See e.g., Volt Info. Sci. v. Bd. of Trs., 489 U.S. 468, 475 (1989). But a party cannot be compelled to arbitrate in the absence of a contractual obligation to do so. See In re Talbott Big Foot, Inc., 887 F.2d 611, 614 (5th Cir. 1989); Genesco, Inc. v. Kakiuchi & Co., 815 F.2d 840,

847 (2d Cir. 1987).

"A court's role under the FAA is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir. 2004) (citing Gannon v. Circuit City Stores, Inc., 262 F.3d 677, 680 (8th Cir. 2001).  The FAA describes the criteria for a valid arbitration clause as follows:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2000).  The FAA guides the Court's review of the clause's scope as follows:

> If any suit . . . brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3.  "The party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 91 (2000).  Any doubts about the scope of the arbitration clause are resolved in favor of arbitration.  AT&T Techs., Inc. v. Commc'n Workers of Am., 475 U.S. 643, 650 (1986).

In this case, the Court finds no ambiguity on the face of the whole of the Arrearages Note or the combination of the Management and Sub-Management Agreements in combination with the Arrearages Note.  Further, the Court finds that the relevant arbitration clause is the broader arbitration

clause found in the Unsecured Arrearages Note. That clause mandates that:

> any dispute [between Block E and MHI] whether sounding in contract, tort or otherwise . . . shall [at MHI's election] be resolved by arbitration . . . and shall . . . include all Disputes arising out of or in connection with (1) this Note or any related agreements or instruments, (2) all past, present and future agreements involving [Block E and MHI], (3) any transactions related to this Note and all past, present and future transactions involving [Block E and MHI], and (4) any aspect of the past, present or future relationship of [Block E and MHI].

(Fulton Aff. Ex. D.) Block E argues that Section 22.5 of the Management Agreement limits the broad language of the Arrearages Note because Section 22.5 states that "nothing in the [Management Agreement] can abrogate [Block E's] rights to any procedure, forum, or remedies provided by the laws of the jurisdiction." (Id. Ex.A (at Ex. G ¶ 4.)) Assuming that the Management Agreement modifies the Arrearages Note, Section 22.5 merely invokes the protections promulgated by the Minnesota Department of Commerce, as enforced via Minnesota Statute 80C.21, that, in the absence of an exclusive arbitration clause, no franchisor may "require a franchisee to waive his or her rights to a jury trial or to waive rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction, or to consent to liquidated damages, termination penalties, or judgment notes." Minn. Rule 2860.4400J. Therefore, the language of Minn. Rule 2860.4400J is not in conflict with the otherwise unambiguous text of the exclusive arbitration clause found in the Arrearages Note.[1] Given the above,

---

[1] This finding is supported by the Minnesota Department of Commerce's modifications to the rule following the decision in Seymour v. Gloria Jean's Coffee Bean Franchising Corp., 732 F. Supp. 988, 990 (D. Minn. 1990). The Seymour court found that the then-existing text of Rule 2860.4400J, which mandated that a franchisee be able to opt out of any exclusive arbitration clause, was preempted by the FAA. A year after the Seymour decision was filed the Department of Commerce adopted the current text of the rule which expressly excepts from its provisions agreements containing an exclusive arbitration clause. See 15 Minn. Reg. 1391 (Dec. 17, 1990), 15 Minn. Reg. 2104 (Mar. 18, 1991).

the Court finds that a valid agreement to arbitrate exists between the parties and that the arbitration clause encompasses Block E's claims against MHI.

The Court also finds that nothing in the language of the arbitration clause deters a finding that the clause represents an <u>exclusive</u> arbitration clause. The text of the note's arbitration clause makes clear that once MHI elected arbitration of the Block E-MHI dispute now before the Court, arbitration became the exclusive remedy available.

The lack of mutuality in the arbitration provision does not render the arbitration clause unenforceable on the record presented here. In the <u>Wiser</u> case cited by Block E, the Eighth Circuit affirmed the district court's order which denied a motion to compel arbitration. 411 F.3d at 925. The district court relied on a Arkansas Supreme Court opinion in ruling that the arbitration clause at issue, which required one but not both parties to a contract to submit disputes to arbitration, was not enforceable. <u>Id.</u> While not deciding definitively what choice of law applies to the present dispute, the Court notes that Section 22.4 of the Management Agreement states "This Agreement shall be construed and interpreted in accordance with and shall be governed and enforced in all respects according to the laws of the State of New York." (Nugent Aff. Ex. A § 22.5.) Block E appears to apply the law of the State of New York in its brief in opposition to Defendants' motion. (Doc. No. 32 at 9.) Under New York law, "Mutuality of remedy is not required in arbitration contracts. If there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement." <u>Sablosky v. Edward S. Gordon Co., Inc.</u>, 535 N.E.2d 643, 646 (N.Y. 1989); <u>see also</u> <u>Barker v. Golf U.S.A., Inc.</u>, 154 F.3d 788, 792 (8th Cir. 1998) (noting that, in <u>Sablosksy</u>, "the New York Court of Appeals expressly held that mutuality is not

11

required in arbitration provisions if there exists consideration for the entire agreement"), cert denied, 525 U.S. 1068 (1999).[2]  Plaintiff makes no argument that the contracts at issue here were not supported by consideration and the availability of any such argument is not evident to the Court.

Thus, the Court recommends staying this litigation as to Block E's claims against MHI.  The Court recommends deferring to the AAA proceeding currently underway any determination about the proper venue of the arbitration, however, the Court notes that Section 22.5 itself states, "The parties hereto acknowledge and agree that Minn. Stat. § 80C.21 and Minn. Rule 2860.4400J prohibit [MHI] from requiring litigation (but not arbitration) from being conducted outside Minnesota."  (emphasis added).

> **B.  Motion to Dismiss Claims Against Bartels and/or Stay Litigation Against Bartels**
>
> **1.  Standard of Review**

While the plaintiff always carries the burden of proof, a plaintiff need only produce prima facie evidence of personal jurisdiction over the defendant to survive a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  Digi-Tel Holdings, Inc. v. Proteq Telecomm., Ltd., 89 F.3d 519, 522 (8th Cir. 1996); Gould v. P.T. Krakatau Steel, 957 F.2d 573,

---

[2] The same is true under Minnesota law.  "Minnesota law . . . does not require mutuality of obligation so long as the contract itself is supported by consideration."  Broadribb v. Globe Airport Sec. Servs., Inc., Civ. No. 03-1187(RHK/JSM), 2003 WL 22136071, at *3 (D. Minn Sept. 15, 2003) (citing Cardinal Consulting Co. v. Circo Resorts, 297 N.W.2d 260, 266 (Minn.1980) ("The concept of mutuality has been widely discredited in contract law and it is now generally recognized that the obligations of the parties need not be substantially equal for there to be a binding contract.")).

575 (8th Cir. 1992), cert. denied, 506 U.S. 908 (1992). In assessing a plaintiff's evidence, the court views the evidence in the light most favorable to the plaintiff and resolves all factual conflicts in the plaintiff's favor. Digi-Tel Holdings, Inc., 89 F.3d at 522. Any "doubt[s] should be resolved in favor of retention of jurisdiction." V.H. v. Estate of Birnbaum, 543 N.W.2d 649, 653 (Minn. 1996). When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings. Stevens v. Redwing, 146 F.3d 538, 546 (8th Cir. 1998) (citing Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947)).[3]

### 2.     Due Process and Personal Jurisdiction

This Court has personal jurisdiction over a foreign defendant if a state court in Minnesota would also have jurisdiction. See Digi-Tel Holdings, Inc., 89 F.3d at 522. Minnesota's reach over foreign defendants extends to the fullest extent permitted by the United States Constitution. See Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526, 528 (8th Cir. 1991) (citing Rostad v. On-Deck, Inc., 372 N.W.2d 717, 719 (Minn. 1985) (en banc), cert. denied, 474 U.S. 1006 (1985)). "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). For the Court to acquire jurisdiction over a non-resident defendant, the defendant's contacts with Minnesota "must be sufficient to cause the defendant to

---

[3] "While in some cases it is more appropriate to test jurisdictional facts upon the proof adduced after full discovery, the court may properly address itself to the jurisdictional issue at any earlier stage of the proceedings where the affidavits and other exhibits presented on motion and opposition thereto make the issue ripe for early determination." Block Industries v. DHJ Industries, Inc., 495 F.2d 256, 259 n.3 (8th Cir. 1974) (citations omitted).

'reasonably anticipate being haled into court'" in Minnesota. Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 648 (8th Cir. 2003) (quoting World-Wide Volkswagen Corp., 444 U.S. 286, 297 (1980)). The contacts with Minnesota must be more than "'random,' 'fortuitous,' or 'attenuated.'" Burger King, 471 U.S. at 475 (citations omitted).

The Eighth Circuit considers the following factors in determining whether personal jurisdiction is proper: (1) the nature and quality of the contacts with the forum state; (2) the quanitity of contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1390 (8th Cir. 1991). The first three factors are the primary factors, the remaining two are secondary factors. Id. The Court looks to all of the contacts in the aggregate and examines the totality of the circumstances in making its determination. Northrup King. Co. v. Compania Productora Semillas Algodoneras, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995.)

Authority over the person may be conferred through either specific or general personal jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 & nn. 8-9 (1984). Here, Block E contends this Court has specific jurisdiction over Bartel. (Doc. No. 32 at 13.) Specific jurisdiction may exist even when "the nonresident's contacts are minimal, but the cause of action arises out of or is related to those contacts." KSTP-FM, LLC v. Specialized Commc'ns, Inc., 602 N.W.2d 919, 923 (Minn. Ct. App. 1999); see also Helicopteros Nacionales de Colombia, S.A., 466 U.S. at 414. Even a single, isolated transaction between a nonresident defendant and a resident plaintiff can be sufficient to justify exercising specific personal jurisdiction. See e.g., McGee v. Int'l Life Ins. Co., 355 U.S. 220, 221-24 (1957).

Here, Bartels traveled to Minnesota in conjunction with the announcement of the Block E-MHI arrangement; Block E alleges he did so as the sole representative of MHI. Additionally, Block E alleges, and Bartels does not dispute, that Bartels traveled to Minnesota to attend the opening of the hotel where he spoke to the staff of the hotel. Finally, Bartels directed telephone calls and other correspondence to Graves in Minnesota as part of the business transaction at the center of this dispute. The Court finds that Block E's factual allegations and the record as a whole demonstrates that this Court does possess specific jurisdiction over Bartels. Bartels should have reasonably anticipated being haled into this jurisdictions given the nature and quality of his contacts and the relationship of these contacts to Block E's cause of action.

Finally, despite finding that personal jurisdiction exists over Bartels, the Court must determine whether the dispute between Block E and Bartels should also be stayed pending the arbitration proceedings that are already underway. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket." Lawson Fabrics, Inc. v. Akzona, Inc., 355 F. Supp. 1146, 1151 (S.D.N.Y. 1973), aff'd, 486 F.2d 1394 (2d Cir. 1973). This power gives "federal courts . . . the discretion to order a stay in multi-party litigation where the issue subject to arbitration is between the principle parties, common to all parties, and central to the resolution of the claims." Gen. Mktg. Svcs., Inc. v. Am. Motorsports, Inc., Civ. No. 02-261 MJD/JGL, 2003 WL 1565943, at *3 (D. Minn. March 5, 2003); see also AgGrow Oils, L.L.C. v. Nat. Union Fire Ins. Co., 242 F.3d 777, 782-83 (8th Cir. 2001); Lawson, 355 F. Supp. at 1151. "A discretionary stay . . . operates to further the strong federal policy in favor of arbitration." Gen. Mktg., 2003 WL 1565943, at *3 (citing AgGrow Oils, 242 F.3d at 782.) The Court finds that the resolution

of the dispute between Block E and Bartels rests on the determination of the same issues required to resolve the dispute between Block E and MHI. Given this finding, the Court recommends staying the litigation as to Bartels pending the outcome of arbitration.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1. Defendants' Motion to Stay Litigation and Motion to Dismiss (Doc. No. 11) be **GRANTED in part and DENIED in part** as set forth herein and proceedings in this matter be stayed pending the outcome of arbitration; and

2. Plaintiffs' Motion to Stay Arbitration (Doc. No. 17) be **DENIED**.

Dated:   October 28, 2005

    s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by November 14, 2005, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Any party wishing to oppose such objections must file and serve all parties with its response. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.